**Iola FORTS et al., Plaintiffs,**

v.

**Benjamin WARD et al., Defendants.**

No. 77 Civ. 1560.

United States District Court,
S. D. New York.

June 17, 1977.

Bronx Legal Services Corp. by Stephen M. Latimer, New York City, of counsel, for plaintiffs.

Louis J. Lefkowitz, Atty. Gen. by Margery Evans Reifler, Asst. Atty. Gen., Leonard J. Pugatch, Deputy Asst. Atty. Gen., New York City, for State defendants Ward, Clement, Reid and Osterman.

Rowley & Forrest, Albany, N. Y. by William Babiskin, Albany, N. Y., for Union defendants Council 82, Clayton DeFayette, Carl F. Gray, Local 1265 and A. V. Yarrell.

## MEMORANDUM AND ORDER

OWEN, District Judge.

Four months ago, the State of New York commenced assigning male correction officers to duties in the housing and hospital units of the Bedford Hills Correctional Facility for Women. Plaintiffs, ten inmates, moved for a preliminary injunction enjoining the State defendants, Benjamin Ward, Frances Clement, Dorothy Reid and Melvin Osterman, Jr. and the union defendants, Security Unit Employees Council 82, Clayton DeFayette, Carl Gray, Local 1265 and A. V. Yarrell, from continuing such assignments on the grounds that they violate the female inmates' constitutionally guaranteed right to privacy.[1]

■ Prior to oral argument, I read the affidavits and briefs submitted by the various parties. On June 9, at oral argument,[2] and after determining that, for the purposes of a preliminary injunction motion, there were no issues of fact requiring a hearing and the standards for granting a preliminary injunction were clearly met,[3]

---

1. Plaintiffs also moved for class action certification, which I denied without prejudice at oral argument.

2. Attorney for the union defendants chose to submit his opposition to the motion, and did not appear at the argument.

3. This memorandum deals with plaintiffs' likelihood of success on the merits. As to a balancing of hardships, plaintiffs are clearly irreparably injured each time their constitutional right to privacy is invaded. Defendants, on the other hand, do not face irreparable injury. No corrections officers will have to be fired; only the selection of work assignments is affected.

*Sonesta Int'l Hotels Corp. v. Wellington Associates,* 483 F.2d 247, 250 (2d Cir. 1973), I granted the preliminary injunction from the bench.

Pursuant to Rule 52(a), F.R.C.P., the following are my findings of fact and conclusions of law upon which the preliminary injunction was granted.

Plaintiffs submitted four affidavits from inmate-plaintiffs alleging inter alia:

"The men correction officers look over the curtains which we use to cover the doorways to our cells when we are on the toilet. They pull these curtains down for no good reason . . . ." [4]

"Men guards have come into the shower room while I am drying myself and watched as I dried and dressed myself." [5]

"It is also embarrassing that male guards are sent around to take the 6:30 a.m. count. I am usually asleep, and I feel very awkward about being awakened and peered at by these men guards when I am completely unable to control what position they observe me sleeping in." [6]

"Finally, I feel very awkward that men are assigned as C.O.'s at the hospital. One time (March 24, 1977), I went to the hospital and was describing to the nurse what my problem which was of a personal, female nature [sic]. There was a man guard directly in front of the medication window, where the nurse was. I was very embarrassed to have to describe the problem in front of the man guard." [7]

■ In their answering affidavits, none of these specific charges was denied. Defendant Carl F. Gray, Executive Director of the local Security Unit Employees union in his affidavit sworn to on June 7, 1977 makes much of the fact that, apparently, no disciplinary action has been taken against any male corrections officers and no grievances have been filed "by plaintiffs pursuant to the inmate grievance procedure with respect to any *particular* male correction officer at Bedford Hills." The decision not to use the grievance system does not rebut plaintiffs' allegations.[8] Plaintiffs did not sit on their rights. Male corrections officers were for the first time assigned to the housing units in February 1977. This complaint was filed on April 1.

Further, defendant Gray is incorrect when he states at ¶ 21 that "[p]laintiffs have presented allegations against unnamed individuals." The affidavits of Yvonne Lee and Linda Marron each name a specific Corrections Officer. None of the defendants submitted affidavits from these Correction Officers challenging the truth of the allegations, nor were affidavits submitted challenging generally the truth of plaintiffs' assertions. For the purposes of this motion, then, I take the allegations of the four affidavits as true.

Instead of rebutting plaintiffs' allegations, defendants claim that the extraordinary relief of a preliminary injunction is not warranted because self-help remedies are available to the inmates. The State, by affidavit, asserts that in addition to the partial curtains covering the open doorway of each cell, which the inmates claim are pushed aside or looked over, there are also solid doors to each cell with a small glass peephole, also coverable with a curtain. These solid doors, the State conceded on the argument, are locked open. They can be closed, on an individual basis, by a corrections officer when the inmate asks for it.

---

4. Affidavit of Bernidienne Watkins sworn to on May 3, 1977. To the same effect are the other affidavits.

5. Affidavit of Carol Crooks sworn to on May 3, 1977.

6. Affidavit of Yvonne Lee sworn to on May 3, 1977.

7. *Id.* For the purposes of this motion, I have not considered the allegations that the male guards do not announce themselves when they come into the housing unit corridors because on May 9, 1977, subsequent to the affidavits, a directive was issued by defendant Ward that absent an emergency situation "correction officers of the opposite sex shall announce their presence in housing areas . . . ."

8. There is no requirement under 42 U.S.C. § 1983 that plaintiffs exhaust administrative remedies such as an inmate grievance procedure.

Based on this, defendants point to the fact "that prison policy permits [the inmates] to request that their doors be closed and the curtains pulled over the windows for fifteen minutes at a time while they are attending to personal needs."[9]

However, it is not a satisfactory solution to the impairment to the fundamental right of privacy that an inmate must ask a corrections officer (who would often be a man) to come and close her door *every time during every day* she wished to use the toilet—and what if she took longer than fifteen minutes?

The State argues that an inmate can dry off and dress in the very stall in which she has showered to avoid male guards' eyes. But why should an inmate have to dry off and dress in a damp shower stall instead of an anteroom made for that purpose in order to preserve her basic human dignity?

Does an inmate have to be awakened or observed during sleep by a male guard, her night garments or bed clothes in possible disarray? Must she discuss personal, female problems with hospital staff when male corrections officers are in the room?

"[C]orrectional inmates are endowed with such constitutional rights as are consistent with inmate status . . . . Status as a correctional inmate entails an immediate loss of solitude. It does not necessarily destroy the other emotional stances and restraints forming the compound called privacy." *In re Long,* 127 Cal. Rptr. 732, 736–37 (Cal.Ct.App.1976).

 There can be little doubt that there is a constitutional right to privacy, which is fundamental and whose abridgment must be supported by a compelling state interest. *Carey v. Population Services Int'l,* —— U.S. ——, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977). Such a right extends to prison inmates. *In re Long.*

9. Affidavit of Margery Reifler, Assistant Attorney General, sworn to on June 8, 1977.

"We cannot conceive of a more basic subject of privacy than the naked body. The desire to shield one's unclothed figured [sic] from view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity." *York v. Story,* 324 F.2d 450, 455 (9th Cir. 1963).

 A prisoner's right of privacy must obviously be circumscribed due to needs of prison security and order. However, these legitimate, compelling state interests are not present here. Male corrections officers were assigned to the housing and hospital units at Bedford Hills in response to a conception by the prison administration and the union of the requirements of Title VII of the 1964 Civil Rights Act, as amended in 1972. The strictures of Title VII, however, do not mandate providing opportunity to possible "Peeping Toms." Because of a prison's need for "unceasing staff surveillance . . . [which] belies the feasibility of supplying wards with places of concealment," *In re Long,* 127 Cal.Rptr. at 737, even the most considerate male guard cannot help but invade an inmate's privacy.

"When undressing in the bedrooms, when bathing, urinating or defecating, the wards must be either visible to the observer, partly visible or available for visibility. When the observer is a [male], an invasion of privacy occurs which is not justified by institutional needs." *Id.*

The "tension between the individual's right to employment without regard to his or her sex and the inmates' right to privacy can be resolved by selective work responsibilities among correctional officers . . . ." *Mieth v. Dothard,* 418 F.Supp. 1169, 1185 (M.D.Ala.1976), *appeal argued,* 45 U.S.L.W. 3705 (U.S. April 19, 1977).[10]

10. *See also Wise v. Reynolds,* 375 F.Supp. 145, 151 (N.D.Tex.1973) (female guards in a male prison).

The preliminary injunction is granted. Submit order.

"Selective work responsibilities among correctional officers excluding from the duties of women assignment to dormitories or shakedowns is reasonable to insure privacy of inmates and does not discriminate against women."