David L. CANEDY, Jr.,
Plaintiff–Appellant,

v.

Officer Peggy BOARDMAN, Warden
Jeffrey Endicott, Karen Radtke, and
John Bell, Defendants–Appellees.

No. 92–2568.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 29, 1993.

Decided Feb. 8, 1994.

Roslyn C. Lieb, Chicago Lawyers' Committee and Timothy S. Bishop (argued), Mayer, Brown & Platt, Chicago, IL, for plaintiff-appellant.

John J. Glinski, Asst. Atty. (argued), Office of the Atty. Gen., Wisconsin Dept. of Justice, Madison, WI, for defendants-appellees.

Before CUMMINGS and CUDAHY, Circuit Judges, and LEINENWEBER, District Judge.*

* The Hon. Harry D. Leinenweber of the United States District Court for the Northern District of Illinois is sitting by designation.

CUDAHY, Circuit Judge.

David Canedy is an inmate at the Columbia Correctional Institution in Portage, Wisconsin. His complaint contains two counts. First, he alleges that during a shakedown of his housing unit, two female prison guards strip searched him, causing him "embarrassment, humiliation and mental distress." Moreover, he contends that this embarrassment could have easily been avoided, as ten male officers were nearby while the two female guards conducted the search. In Canedy's second count he claims that female officers regularly observe male inmates in a variety of settings typically considered private, including while they dress, shower, defecate and sleep in various states of undress. He thus brought this action under 42 U.S.C. § 1983, seeking injunctive relief, including accommodations for his privacy rights, as well as damages.

The district court dismissed the complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a cause of action for which relief can be granted. According to the district court, whatever privacy interest Canedy might have is outweighed by the state's interest in providing equal employment opportunity for female prison guards. "If female guards are to be given equal opportunity for employment and promotion, it is necessary to allow them to observe male prisoners and conduct searches just as male officers would. To exclude females from observing or participating in all aspects of guard work could prevent them from gaining the experience they need to advance to higher positions, and bar them from assuming those positions that require monitoring of inmate searches or other activities in which inmates are unclothed." Opinion & Order (June 22, 1992) at 9.

At the outset we address a question of res judicata. This suit is not the only action that Canedy has brought challenging these practices. When Canedy filed his complaint in the current action, another case involving similar issues (though different defendants) was also pending before Judge Crabb. That suit, *Canedy v. Erikson*, No. 92–C–108, was

filed a month before Canedy filed the complaint in the current action. The defendants therefore argue that, the merits aside, the duplication of litigation provides grounds to affirm the district court's dismissal of this action.

 That another case is pending does not raise questions of res judicata. Only a prior *judgment* is entitled to preclusive effect, and the district court entered final judgment in this case *before Erikson* was decided. In entering final judgment in this case, the court therefore faced no issue of res judicata.

 When it later decided *Erikson*, it reached the same result as it did here, relying on the same reasoning it employed in dismissing this case. The defendants now argue that allowing the repeated litigation of the same issues is a waste of judicial resources. But this misunderstands the doctrine of res judicata. Judicial resources are conserved by asserting the previous judgment as a defense to a subsequent claim. If this claim and the one in *Erikson* are the same, the *Erikson* defendants could have argued that the final judgment in this case should have made the matter in *Erikson* res judicata (but note that, while the pendency of this appeal does not affect the "finality" of a judgment for res judicata purposes, a previous judgment is a bar to further litigation on that claim only between the same parties or those in privity with them, *see McVeigh v. McGurren*, 117 F.2d 672, 678 (7th Cir.), *cert. denied*, 313 U.S. 573, 61 S.Ct. 960, 85 L.Ed. 1531 (1941)). But because the judgment in this case was first, there is no res judicata issue here. As Canedy argues, the district court perhaps could have consolidated these two cases as Fed.R.Civ.P. 42(a) allows, but that is a matter committed to the sound discretion of the trial judge. *United States v. Knauer*, 149 F.2d 519 (7th Cir.1945), *aff'd*, 328 U.S. 654, 66 S.Ct. 1304, 90 L.Ed. 1500 (1946).

 We therefore turn to the merits. The right to privacy is now firmly ensconced among the individual liberties protected by our Constitution. *Planned Parenthood v. Casey*, —— U.S. ——, —— ——, 112 S.Ct. 2791, 2804–08, 120 L.Ed.2d 674 (1992). Moreover, "[o]ne of the clearest forms of degradation in Western Society is to strip a person of his clothes. The right to be free from strip searches and degrading body inspections is thus basic to the concept of privacy." 3 George B. Trubow, ed., *Privacy Law and Practice*, ¶ 25.02[1] (1991). "It is settled now ... that the Constitution places limits on a State's right to interfere with a person's ... bodily integrity." *Casey*, —— U.S. at ——, 112 S.Ct. at 2806. Further, as the district court noted, while all forced observations or inspections of the naked body implicate a privacy concern, it is generally considered a greater invasion to have one's naked body viewed by a member of the opposite sex. *See York v. Story*, 324 F.2d 450, 455 (9th Cir.1963) ("The desire to shield one's unclothed figure from views of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity.").[1]

 Some diminution of privacy is of course to be expected in prison. *See Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (prisoners are entitled to no reasonable expectation of privacy in their prison cells insuring them of Fourth Amendment protection against unreasonable searches and seizures). Inmates surely do not enjoy the full sweep of constitutional rights afforded other members of society. But even so, those who are convicted of criminal offenses do not surrender all of their constitutional rights. "Lawful imprisonment necessarily makes unavailable many rights and privileges of the ordinary citizen, a 'retraction justified by the considerations underlying our penal system.' But, though his rights may be diminished by the needs and exigencies of the institutional environment, a

1. We note that *York*, many of the cases discussed below involving cross-gender observations and strip searches, as well as Canedy's brief on appeal here, make a common assumption. In their declaration that "the nudity taboo, and hence the invasion of privacy involved when it is forcibly broken, is much greater between the sexes than among members of the same sex," Pl.Br. at 13, these authorities and submissions appear to assume that all of the relevant actors are heterosexual.

prisoner is not wholly stripped of constitutional protection when he is imprisoned for a crime. There is no iron curtain drawn between the Constitution and the prisons of this country." *Wolff v. McDonnell,* 418 U.S. 539, 555–56, 94 S.Ct. 2963, 2974–75, 41 L.Ed.2d 935 (1974) (quoting *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948)).

▪ Thus, this court's precedents have long recognized that, while "the justifiable reasons for invading an inmate's privacy are both obvious and easily established," the "surrender of privacy is not total and that some residuum meriting [constitutional protection] survives the transfer into custody." *Bonner v. Coughlin,* 517 F.2d 1311, 1317 (7th Cir.1975), *mod. en banc,* 545 F.2d 565 (1976), *cert. denied,* 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 529 (1978). To this end, while the Supreme Court has permitted prison officials to conduct body cavity searches of prisoners after every visit with a person from outside the prison, it has emphasized that the "searches must be conducted in a reasonable manner." *Bell v. Wolfish,* 441 U.S. 520, 560, 99 S.Ct. 1861, 1885, 60 L.Ed.2d 447 (1979). The judicial inquiry, then is to "balanc[e] the significant and legitimate security interests of the institution against the privacy interests of the inmates." *Id.*

Prison officials have an obvious interest in security. But that is not the only legitimate interest that might justify restricting inmates' privacy rights. In *Smith v. Fairman,* 678 F.2d 52 (7th Cir.1982) (per curiam), this court, like other courts of appeals before and since, concluded that a state's interest in providing equal employment opportunity for prison guards should likewise be weighed against the invasion of a prisoner's privacy interest.

Like the plaintiff in *Smith,* Canedy's objection "is not to being searched, but rather to being searched by a member of the opposite sex." *Id.* at 54. As noted, Canedy also objects to other prison practices, but the nature of his objection is the same: his privacy interest is invaded because female guards regularly see his naked body.[2] As we noted in *Smith,* except for unusual circumstances like those presented in *Dothard v. Rawlinson,* 433 U.S. 321, 334, 97 S.Ct. 2720, 2729, 53 L.Ed.2d 786 (1977) (where the Supreme Court emphasized the "jungle atmosphere" of the Alabama prison at issue), a state "may not refuse to hire women as guards in a male prison." *Smith,* 678 F.2d at 54. *Cf. Torres v. Wisconsin Dept. of Health and Social Svcs.,* 859 F.2d 1523 (7th Cir.1988) (en banc).

That being the case, it follows that prisons must be allowed to "utilize female guards to the fullest extent possible." *Smith,* 678 F.2d at 54. But that does not mean "that inmates are without constitutional protection against invasion of their privacy by members of the opposite sex." *Id.* Thus, we observed in *Smith* that in *Forts v. Ward,* 471 F.Supp. 1095 (S.D.N.Y.1979), *vacated in part,* 621 F.2d 1210 (2d Cir.1980), the court "ordered that adjustments be made either in scheduling or in the physical structure of the facili-

---

**2.** While a religion-based allegation does not appear in his complaint, in Canedy's brief he asserts that having his naked body exposed to female guards particularly burdens him because he is a Muslim, and Islam has a very strong nudity taboo. He therefore indicates that he may seek to amend his complaint to assert a violation of his rights under the free exercise clause of the First Amendment. We note that until recently, such a complaint would appear to challenge a religiously "neutral, generally applicable" practice, and therefore be doomed to fail under *Employment Division v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). But the President recently signed into law the Religious Freedom Restoration Act (RFRA), Pub.L. No. 103–141, 107 Stat. 1488 (1993). That legislation purports to reverse *Smith,* declaring that "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless it "is in the furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling interest." RFRA § 3. The constitutionality of this legislation—surely not before us here—raises a number of questions involving the extent of Congress's powers under Section 5 of the Fourteenth Amendment. *See generally Katzenbach v. Morgan,* 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966); Robert A. Burt, *Miranda and Title II: A Morganic Marriage,* 1969 S.Ct.Rev. 81; Archibald Cox, *The Role of Congress in Constitutional Determinations,* 40 U.Cinn.L.Rev. 199 (1971); William Cohen, *Congressional Power to Interpret Due Process and Equal Protection,* 27 Stan.L.Rev. 603 (1975); Comment, *When the Supreme Court Restricts Constitutional Rights, Can Congress Save Us? An Examination of Section 5 of the Fourteenth Amendment,* 141 U.Pa.L.Rev. 1029 (1993).

ties to protect the women inmates from male surveillance while they were dressing or undressing, showering, using the toilet facilities, or sleeping in the housing units." *Smith,* 678 F.2d at 54–55.

"Other courts," *Smith* continues, "have reached essentially the same conclusion":

> While recognizing the right of one sex not to be discriminated against in job opportunities within the prison because of their gender, they have also concluded that inmates do have some right to avoid unwanted intrusions by persons of the opposite sex. The resulting conflict between these two interests has normally been resolved by attempting to accommodate both interests through adjustments in scheduling and job responsibilities for the guards.

*Id.* at 55. *Smith* involved an Illinois prison where female guards would conduct pat-down searches on fully clothed male inmates. We concluded there that "by instructing female guards to exclude the genital area on male inmates in conducting a frisk, defendants have afforded plaintiff whatever privacy right he may be entitled to in this context." *Id.* Thus, by "limiting the nature and scope of the search female guards are allowed to conduct on male inmates, it has sought to accommodate the right of women to equal employment opportunities with the male inmates' right to privacy." *Id.*

Almost every federal court that has addressed this issue has come to the conclusion that the Constitution demands such an accommodation, and that where these competing interests cannot be reconciled, a state's interest in providing equal employment opportunity for female guards needs to be weighed against the privacy rights of prisoners. The cases therefore hold that sex is not a bona fide occupational qualification preventing women from working in all-male prisons, and that pat-down searches and occasional or inadvertent sighting by female prison employees of inmates in their cells or open showers do not violate the inmates' right to privacy. But that right is violated where this observation is more intrusive (like a strip search, in the absence of an emergency) or a regular occurrence. *See Cookish v. Powell,* 945 F.2d 441 (1st Cir.1991) (per cu-

riam); *Forts v. Ward,* 621 F.2d 1210 (2d Cir.1980); *Lee v. Downs,* 641 F.2d 1117 (4th Cir.1981); *Kent v. Johnson,* 821 F.2d 1220 (6th Cir.1987); *Gunther v. Iowa State Men's Reformatory,* 612 F.2d 1079 (8th Cir.), *cert. denied,* 446 U.S. 966, 100 S.Ct. 2942, 64 L.Ed.2d 825 (1980); *Timm v. Gunter,* 917 F.2d 1093 (8th Cir.1990); *Grummett v. Rushen,* 779 F.2d 491 (9th Cir.1985); *Michenfelder v. Sumner,* 860 F.2d 328 (9th Cir.1988); *Jordan v. Gardner,* 986 F.2d 1521 (9th Cir. 1993); *Cumbey v. Meachum,* 684 F.2d 712 (10th Cir.1982); *Hardin v. Stynchcomb,* 691 F.2d 1364 (11th Cir.1982); *Bowling v. Enomato,* 514 F.Supp. 201 (N.D.Cal.1981); *Robbins v. South,* 595 F.Supp. 785 (D.Mont. 1984); *Miles v. Bell,* 621 F.Supp. 51 (D.Conn. 1985); *Smith v. Chrans,* 629 F.Supp. 606 (C.D.Ill.1986); *Johnson v. Pennsylvania Bureau of Corrections,* 661 F.Supp. 425 (W.D.Pa.1987). *See also Meriwether v. Faulkner,* 821 F.2d 408, 418 (7th Cir.1987) (a transsexual inmate housed in an all-male prison has a privacy interest in not being "regularly forced to strip before guards and other inmates" if "unrelated to prison needs"); *Reidt v. County of Trempealeau,* 975 F.2d 1336, 1339 n. 3 (7th Cir.1992) (citing cases as recognizing that "Title VII's proscription against sexual discrimination in employment must be balanced against issues of inmate privacy and jail security"); Comment, *Sex Discrimination in Prison Employment: The Bona Fide Occupational Qualification and Prisoners' Privacy Rights,* 65 Iowa L.Rev. 428, 445 (1980) ("In the prison setting the courts should continue to balance not only the interest of the prison and the job applicant, but the interests of the prisoner as well.").

The defendants point out that two district courts have concluded that observation alone of male inmates by female guards does not violate a constitutionally protected privacy interest, *see Griffin v. Michigan Dept. of Corrections,* 654 F.Supp. 690 (E.D.Mich.1982) ("Inmates do not possess any protected right under the Constitution against being viewed while naked by correctional officers of the opposite sex."); and *Bagley v. Watson,* 579 F.Supp. 1099, 1103 (D.Or.1983) ("Male prisoners in the Oregon correctional institutions

have no federal constitutional rights to freedom from clothed 'pat-down' frisk searches and/or visual observations in states of undress performed by female correctional officer guards."). These two district court decisions are the exceptions that prove the rule. For the overwhelming majority of the cases have declined to fashion such categorical rules, but rather have required that reasonable accommodations be made, and that the respective interests be balanced.

 Canedy, here, is asking only for such an accommodation: that shower curtains be installed, that prison officials allow cell windows to be covered briefly when an inmate undresses or uses the toilet, that sleepwear be provided and that female guards strip search male inmates only in emergencies. We need not now determine which if any of these accommodations of Canedy's privacy rights are required by the Constitution. But as the district court noted, the procedural posture of this case required it to accept as true all of the plaintiff's allegations and any inferences reasonably drawn from the alleged facts. "[A]mbiguities in complaints in federal court should be interpreted in favor of plaintiffs, not defendants." *Early v. Bankers Life and Casualty Co.*, 959 F.2d 75, 79 (7th Cir.1992). The suit should go forward as long as "relief is possible under any set of facts that could be consistent with the allegations." *Bartholet v. Reishasuser A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir.1992). Whether Canedy is entitled to relief turns on whether the facts he alleges (and implies) turn out to be true.

His complaint can fairly be read to allege that he has been subject to strip searches by female prison guards, and that no effort has been made to accommodate his privacy interests with the prison's legitimate interests in security and in providing equal employment opportunity. The district court nonetheless dismissed the suit, apparently concluding that in light of the need to allow female guards "to observe male prisoners and conduct searches *just as male officers would*," no such accommodation is necessary. Opinion & Order (June 22, 1992) at 9 (emphasis supplied). The court noted, however, that it "does not follow from this holding that prison officials should not adopt measures designed to afford privacy to inmates whenever it is reasonable to do so." *Id.*

 But where it *is* reasonable—taking account of a state's interests in prison security and in providing equal employment opportunity for female guards—to respect an inmate's constitutional privacy interests, doing so is not just a palliative to be doled out at the state's indulgence. It is a constitutional mandate.

Because Canedy's complaint can fairly be read to state a cause of action under § 1983, we REVERSE the dismissal of his complaint, and REMAND the matter for further proceedings consistent with this opinion.