# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CHARLES EDWARD BYRD,
          *Plaintiff-Appellant,*

          v.

MARICOPA COUNTY SHERIFF'S
DEPARTMENT; JOSEPH M. ARPAIO;
KATHLEEN O'CONNELL; AUSTIN
PETERSON; DURANGO JAIL,
          *Defendants-Appellees.*

No. 07-16640

D.C. No.
CV-04-02701-NVW

OPINION

Appeal from the United States District Court
for the District of Arizona
Neil V. Wake, District Judge, Presiding

Argued and Submitted
December 15, 2009—San Francisco, California

Filed January 5, 2011

Before: Alex Kozinski, Chief Judge, Mary M. Schroeder,
Sidney R. Thomas, Susan P. Graber, Raymond C. Fisher,
Ronald M. Gould, Richard A. Paez, Richard C. Tallman,
Johnnie B. Rawlinson, Carlos T. Bea and N. Randy Smith,
Circuit Judges.

Opinion by Judge Rawlinson;
Partial Concurrence and Partial Dissent by
Judge N. R. Smith

## COUNSEL

Douglas B. Adler, Robert J. Herrington (argued), and Byron McLain, Skadden, Arps, Slate, Meagher & Flom LLP, Los Angeles, California, for the plaintiff-appellant.

Eileen D. GilBride, Jones, Skelton & Hochuli, P.L.C., Phoenix, Arizona, for the defendants-appellees.

## OPINION

RAWLINSON, Circuit Judge:

Charles E. Byrd (Byrd), a pretrial detainee at the time, was subjected to a cross-gender strip search of his genital area. Because the strip search was unreasonable under the facts of this case, we reverse the district court's entry of judgment in

favor of Defendants-Appellees Maricopa County Sheriff's Department and then-cadet Kathleen O'Connell (O'Connell).

## I. BACKGROUND

While Byrd was a pretrial detainee in a minimum-security facility, Maricopa County jail officials ordered a search of Byrd's entire housing unit (approximately ninety inmates). It is undisputed that no emergency existed. Rather, the search was precipitated by the occurrence of several fights and a suspicion of contraband in the jail.

Maricopa County Special Response Team officers carrying pepper ball guns and tasers entered the facility. They ordered Byrd to remove all clothing except his boxer shorts, which were pink and made of a very thin material. Once the inmates in the housing unit formed a line, jail officials ordered four to six inmates at a time into the "day room," a common area, to be searched. Cadets from the detention officer training academy searched the inmates with training supervisors present. The cadets wore jeans and white t-shirts with their last names printed on the back. They were not otherwise identified.[1] Approximately twenty-five to thirty cadets and ten to fifteen uniformed detention officers were present in the day room. However, none of the detention officers participated in the searches. At least one person videotaped the cadets' search of the inmates.

---

[1]This fact is important because of our undisputed recognition of the "feelings of humiliation and degradation associated with forcibly exposing one's nude body to strangers . . ." *Way v. County of Ventura*, 445 F.3d 1157, 1160 (9th Cir. 2006), quoting *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1446 (9th Cir. 1989); *see also Hayes v. Marriott*, 70 F.3d 1144, 1147 (10th Cir. 1995). After years of litigation, the dissent in hindsight declares that "it was surely apparent that the cadets were present in an official capacity." Dissenting Opinion, p. 401. n.5. However, that apparentness is not reflected in the record.

Byrd was searched by a female cadet. He testified that, during the searches, male detention officers stood by watching. The record clearly reflects that only four inmates were searched at a time, by no means an overwhelming number.[2] Although no factual finding was made on this point by either the judge or the jury, contrary to the dissent, it was by no means "undisputed . . . that the County did not have sufficient numbers of male detention officers to conduct searches of male inmates without the assistance of female officers." Dissenting Opinion, pp. 397-98.

When Byrd entered the day room, the cadets were lined up and waiting. O'Connell ordered him to turn away from her, spread his feet and raise his arms above his head. Wearing latex rubber gloves, she pulled out Byrd's waistband a few inches and felt the waistband to make sure nothing was hidden in it. O'Connell did not look inside Byrd's boxer shorts.

Next, O'Connell placed one hand on Byrd's lower back holding the back part of the boxer shorts and, with her other hand, searched over his boxer shorts, his outer thigh from his hip to the bottom of the shorts. She then moved her hand from his outer thigh to the bottom of the shorts on his inner thigh and applied slight pressure to feel his inner thigh for contraband. Using the back of her hand, O'Connell moved Byrd's penis and scrotum out of the way applying slight pressure to search the area. O'Connell then searched the other side using the same technique.

---

[2]The dissent takes issue with Byrd's testimony that male officers were standing idly by. *See* Dissenting Opinion, p. 397 n.4. However, this is precisely the type of evidence considered by the Fifth Circuit in *Moore v. Carwell*, 168 F.3d 234, 237 (5th Cir. 1999) (giving credence to Plaintiff's contention that male officers were present during the search, thereby suggesting that male officers were available to conduct the searches). Indeed, the referenced testimony of Officer Peterson does not specifically address the availability of the male officers to conduct the searches in question. *See id.*

Finally, O'Connell placed her hand at the bottom of Byrd's buttocks and ran her hand up to separate the cheeks while applying slight pressure, to search for contraband inside his anus. O'Connell estimated that the search lasted ten to twenty seconds, and Byrd estimated that the search took sixty seconds. After the search was completed, Byrd was directed to go to the opposite end of the day room, and sit facing the wall.

On the day of the search, Byrd filed an inmate grievance complaining that O'Connell "grab[bed] [his] balls and [his] scrotum." Byrd filed three additional inmate grievances to no avail. Byrd subsequently filed a *pro se* complaint naming Maricopa County Sheriff Joseph Arpaio (Arpaio), O'Connell, and Captain Austin Peterson (Peterson) as defendants. The complaint alleged that the search violated Byrd's right under the Fourth Amendment to be free from unreasonable searches, and Byrd's rights under the Fourteenth Amendment to equal protection of the laws and substantive due process protection to be free from punishment.[3]

The district court dismissed Byrd's equal protection claim but denied Maricopa County's motion for summary judgment on Byrd's Fourth Amendment unreasonable search claim and his Fourteenth Amendment substantive due process claims. The court also appointed counsel to represent Byrd at trial.

Following the presentation of evidence, the district court granted judgment as a matter of law in favor of Peterson, O'Connell's supervisor, on the premise that Peterson was not connected to the search. Byrd does not challenge this ruling on appeal.

---

[3]Byrd's complaint actually referenced his Eighth Amendment right to be free from cruel and unusual punishment. The district court properly recharacterized this claim as a substantive due process claim under the Fourteenth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 535 & n.16 (1979) (explaining that the Due Process Clause applies when "considering the claims of pretrial detainees").

Additionally, the district court granted judgment as a matter of law in favor of Arpaio, finding that Byrd presented no evidence that Arpaio had instituted an unconstitutional policy or had personally participated in the search. The court also ruled as a matter of law that the search was constitutionally valid. Thus, with O'Connell as the only defendant, the district court narrowed the issues to be presented to the jury to these three:[4] (1) whether "O'Connell deprived [Byrd] of his right against unreasonable search by intentionally squeezing or kneading his penis or scrotum or improperly touching his anus through his underwear;" (2) whether "O'Connell deprived [Byrd] of due process of law" by "intentionally squeez[ing] or knead[ing] [Byrd's] penis or scrotum or improperly touch[ing] his anus through his underwear," with "[O'Connell's] actions inflict[ing] [wanton] pain on [Byrd];" and (3) whether "O'Connell deprived [Byrd] of his right against unreasonable search by conducting a search not done for [an] identified security need."[5]

The district court's formulation of these three issues for the jury's consideration completely eliminated the jury's contemplation of whether the cross-gender strip search violated Byrd's right under the Fourth Amendment to be free from unreasonable search. Instead, the district court's formulation of the factual issues presented to the jury limited the determination of reasonableness under the Fourth Amendment to whether O'Connell "intentionally squeezed or kneaded [Byrd's] penis or scrotum or improperly touched his anus

---

[4]Because O'Connell was acting in her capacity as a cadet with the Maricopa County Sheriff's Office, Maricopa County remained a putative defendant. *See Palomar Pomerado Health Sys. v. Belshe*, 180 F.3d 1104, 1108 (9th Cir. 1999) ("The general rule is that relief sought nominally against a state officer is in fact against the sovereign if the decree would operate against the latter.") (citations, alterations, and internal quotation marks omitted).

[5]Because this description is virtually identical to that articulated by our colleagues in dissent, *see* Dissenting Opinion, p. 393, we are puzzled by the accusation that we "paint[ed] the facts differently on appeal." *Id.*

through his underwear." The jury found in favor of O'Connell on all counts.

In *Byrd v. Maricopa County Sheriff's Dep't*, 565 F.3d 1205 (9th Cir. 2009), a divided panel of this court affirmed the district court's judgment. We subsequently granted rehearing en banc, 583 F.3d 673 (9th Cir. 2009).

## II.    STANDARD OF REVIEW

We review an order granting or denying judgment as a matter of law *de novo*. *See Mangum v. Action Collection Serv., Inc.*, 575 F.3d 935, 938 (9th Cir. 2009). "Judgment as a matter of law is appropriate when the evidence presented at trial permits only one reasonable conclusion. That is, a motion for judgment as a matter of law is properly granted only if no reasonable juror could find in the non-moving party's favor." *Id.* at 938-39 (citations, alteration, and internal quotation marks omitted).

## III.    DISCUSSION

### A.    Substantive Due Process and Equal Protection Claims

Byrd did not strenuously press his substantive due process and equal protection claims during the *en banc* argument. In fact, Byrd's counsel candidly acknowledged that there was "a basis" for the panel's affirmance of the district court's decision to dismiss Byrd's equal protection claim for failure to state a claim. We review this basis for dismissal *de novo*, and may affirm the dismissal for any reason supported by the record. *See Thompson v. Paul*, 547 F.3d 1055, 1058-59 (9th Cir. 2008).

A peripheral equal protection issue was in the air because of the text of Maricopa County's Contraband Control Policy (Contraband Policy) distinguishing between male and female

inmates when a frisk search is involved. According to the Contraband Policy, "[m]ale inmates may be frisk searched by either male or female officers[,]" but "[f]emale inmates will only be searched by female officers, absent exigent circumstances." However, there are two considerations that counsel against delving too deeply into the equal protection issue. The first is Byrd's concession of "a basis" for the ultimate dismissal of his equal protection claim. The second is the lack of a factual record to properly analyze the equal protection claim.

**[1]** It is important to note that Byrd did not challenge the Contraband Policy on which Maricopa County relied in its opposition to Byrd's claims. Rather, Byrd's equal protection claim was couched generally in terms of the treatment of male inmates, without reference to the policy. In any event, the Contraband Policy does not establish the reasonableness of the search. The Contraband Policy expressly provides that "[s]trip searches will be conducted by an officer of the same sex as the inmate . . . ." Under the Contraband Policy a strip search is defined as a "visual scan of the inmate's skin after all clothing has been removed." Maricopa County seizes on this definition to argue that the search performed on Byrd was not a strip search because Byrd was wearing very thin boxer shorts. Rather, Maricopa County maintains that Byrd was subjected to a frisk search.

**[2]** The Contraband Policy defines a frisk search as "[c]arefully examining an inmate by inspecting his clothing, and feeling the contours of his *clothed body* . . ." (emphasis added). The Contraband Policy provides that "[t]he inmate's shoes and socks may be removed . . ." However, no mention is made of the removal of other clothing as part of a frisk search. In sum, the search was not properly conducted as a strip search under the Contraband Policy because it was not conducted by staff of the same gender, and it was not limited to a visual inspection of Byrd's body. The search was not properly conducted as a frisk search under the Contraband

Policy because Byrd was not clothed as contemplated in the policy. The particular search conducted in this case simply does not fall within the contours of the Contraband Policy. Therefore, no basis exists for concluding that the provisions of the Contraband Policy defeat Byrd's equal protection claim.

**[3]** The district court dismissed Byrd's equal protection claim as one premised on the disparate treatment of prisoners and found, without acknowledging the gender element, that prisoners are not a suspect class. However, given the existence of a facially discriminatory contraband policy, an equal protection claim based on the disparate treatment of male and female prisoners was viable. *See Wyatt v. Terhune*, 315 F.3d 1108, 1111-12 (9th Cir. 2003) (acknowledging a male inmate's equal protection claim based on prison grooming regulations that did not apply to female inmates); *Jeldness v. Pearce*, 30 F.3d 1220, 1231 (9th Cir. 1994) (recognizing disparate treatment of male and female prisoners, but declining to reach the equal protection question); *Roubideaux v. N.D. Dep't of Corr. & Rehab.*, 570 F.3d 966, 974 (8th Cir. 2009) (applying heightened review standard to statutes containing a "gender-based classification on their face"); *Pitts v. Thornburgh*, 866 F.2d 1450, 1453 (D.C. Cir. 1989) (same for prison policies).

**[4]** Although the Contraband Policy was part of the record before the district court, Byrd's complaint made no reference to it and his equal protection allegation largely repeated the facts that formed the basis of his other claims. Even construing Byrd's *pro se* complaint liberally, the allegations failed to state an equal protection claim because they asserted only allegedly harmful treatment and mentioned nothing about disparate treatment, much less about the specific jail policy or gender classification in general. *See Weilburg v. Shapiro*, 488 F.3d 1202, 1205 (9th Cir. 2007) ("*Pro se* complaints are to be construed liberally . . ."); *see also Pena v. Gardner*, 976 F.2d 469, 471 (9th Cir. 1992) *as amended* (noting that "a liberal

interpretation of a pro se civil rights complaint may not supply essential elements of the claim that were not initially pled . . ."). For that reason, we do not take issue with the ultimate ruling dismissing Byrd's equal protection claim.

**[5]** As for the substantive due process claim, Byrd failed to allege or produce evidence that O'Connell or Arpaio expressed an intent to punish Byrd or that the search was unrelated to a "legitimate governmental objective." *Bell*, 441 U.S. at 538-39 (explaining that the critical inquiry is "whether particular restrictions and conditions accompanying pretrial detention amount to punishment in the constitutional sense of that word" and that, "if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to punishment") (footnote reference and internal quotation marks omitted).

**[6]** In the alternative, punitive intent may be inferred. *See id.* ("[I]f a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not be constitutionally inflicted upon detainees *qua* detainees." (citation and footnote omitted)). It is undisputed that the search in this case was prompted by several recent fights and suspicion of contraband. Because a search premised on such security concerns is reasonably related to legitimate goals of detention officials, *see, e.g., Michenfelder v. Sumner*, 860 F.2d 328, 333 (9th Cir. 1988), no basis exists to draw an inference of intent to punish Byrd. In the absence of evidence of an intent to punish, or evidence that Maricopa's actions were unrelated to a "legitimate governmental objective," the district court properly granted judgment as a matter of law in favor of O'Connell and Arpaio on Byrd's Fourteenth Amendment substantive due process claim. *Bell*, 441 U.S. at 539 n.20 ("[I]n the absence of a showing of intent to punish, a court must look to see if a particular restriction or condition, which may on its face appear to be

punishment, is instead but an incident of a legitimate nonpunitive governmental objective.") (citations omitted).

## B.   Unreasonable Search and Seizure

**[7]** The district court granted judgment as a matter of law in favor of O'Connell on the issue of whether the cross-gender strip search violated Byrd's right under the Fourth Amendment to be free from unreasonable searches. We review this decision *de novo*, keeping in mind that "[j]udgment as a matter of law is appropriate when the evidence presented at trial presents only one reasonable conclusion. . ." *Mangum*, 575 F.3d at 938 (citation and internal quotation marks omitted). In the context of this case, judgment as a matter of law would be appropriate only if the evidence presented at trial led inevitably to the conclusion that the cross-gender strip search was reasonable. Whether a search is reasonable under the Fourth Amendment requires a case-by-case "balancing of the need for the particular search against the invasion of personal rights that the search entails . . ." *Bell*, 441 U.S. at 559. The required factors for courts to consider include: (1) "the scope of the particular intrusion," (2) "the manner in which it is conducted," (3) "the justification for initiating it," and (4) "the place in which it is conducted." *Id.* (citations omitted).[6]

We approach this issue by reiterating our longstanding recognition that "[t]he desire to shield one's unclothed figure from [the] view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity." *York v. Story*, 324 F.2d 450, 455 (9th Cir. 1963); *see also Michenfelder*, 860 F.2d at 333 (same); *Grum-*

---

[6]Because Byrd did not challenge the constitutionality of the Contraband Policy, and because the district court focused on the facts of the actual search conducted rather than on the provisions of the Contraband Policy, we apply the *Bell* factors rather than those articulated in *Turner v. Safley*, 482 U.S. 78, 81 (1987), which addresses inmate challenges to regulations.

*mett v. Rushen*, 779 F.2d 491, 496 (9th Cir. 1985) (distinguishing cross-gender searches that "are done briefly and while the inmates are fully clothed, and thus do not involve *intimate contact with the inmates' bodies*") (emphasis added). It is not surprising that a connection has been made between cross-gender searches and the level of sexual impropriety between inmates and corrections personnel. *See, e.g.,* Nicholas D. Kristof, Op-Ed., *Kids in Crisis (Behind Bars)*, N.Y. TIMES, Jan. 28, 2010, at A33 (discussing a "stunning new Justice Department special report" finding that cross-gender assignments in prisons foster abuse of inmates by male and female officers); Connie Rice and Pat Nolan, Op-Ed, *Policing Prisons*, L.A. TIMES, Apr. 5, 2010, at A13 (citing to the June, 2009, National Prison Rape Elimination Commission Report (Commission Report)).

In the preface to the Commission Report, The Honorable Reggie B. Walton, Chair of the Commission, noted that the Commission was "challenged to examine problems that we wish did not exist and confronted with accounts of sexual abuse that shocked and saddened us . . ." Commission Report at vi. The Commission explicitly recognized that "searches carried out by staff of the opposite gender heighten the potential for abuse . . . . In the Commission's view, the risks are present whether the officers are male or female." *Id.* at 62 (footnote reference omitted).[7]

---

[7]The dissent denigrates our citation to the findings of this esteemed body of experts, accusing us of failing to defer to the judgment of the prison officials. *See* Dissenting Opinion, p. 393 n.2. Our response is twofold: (1) There is nothing nefarious or unusual about citing to secondary sources to illuminate our analysis, *see, e.g.*, *United States v. Weber*, 451 F.3d 552, 561 n.13 (9th Cir. 2006) (listing cases relying on secondary sources to explain the court's analysis); and (2) the Maricopa County officials never exercised their "collective wisdom" in this case to decide that cross-gender strip searches were in order. In fact, the officials denied that any strip search was ever conducted. It would be strange indeed if the officials in their "collective wisdom" ordered cross-gender strip searches in this instance when the "collective wisdom" memorialized in the written policy expressly prohibits cross-gender strip searches.

Although the Commission acknowledged that cross-gender supervision "can have benefits," it nevertheless determined that "[t]o prevent abuse, . . . the standard on this subject strictly prohibits non-medical staff from conducting cross-gender strip and visual body cavity searches—except in the case of emergency—because of their extraordinarily intrusive nature." *Id.* at 63.

The Commission's findings are consistent with the standards adopted by the American Correctional Association, the accrediting body for adult correctional facilities. *See* Standards For Adult Correctional Institutions (2003).

Section 4-4194 addresses cross-gender strip searches, articulating the standard as follows:

> Written policy, procedure and practice provide that, except in emergency situations, visual inspections of inmate body cavities are conducted by officers of the same sex, in private . . .

*Id.* at 53.

**[8]** Applying the *Bell* factors in the context of our precedent recognizing the privacy interest of inmates in their personal dignity, giving credence to the compelling findings made by the Commission, and acknowledging the applicable accrediting standards, we conclude that the cross-gender strip search of Byrd was unreasonable as a matter of law. O'Connell touched Byrd's inner and outer thighs, buttocks, and genital area with her latex-gloved hand through very thin boxer shorts. She moved his penis and scrotum in the process of conducting the search. The scope of this intrusion totally thwarted any desire on Byrd's part to "shield [his] unclothed figure from [the] view of strangers . . . of the opposite sex . . ." *York*, 324 F.2d at 455. The scope of the intrusion in this case far exceeds searches we have previously sanctioned and weighs in favor of a finding of unreasonableness.

In *Grummett*, 779 F.2d at 493, 495, we upheld a system of assigning female officers within a correctional facility such that they occasionally *viewed* male inmates in various states of undress and regularly conducted routine pat-down searches of inmates that did not involve intimate contact with the inmate's body. We expressly noted that "female officers [were] *not* assigned positions in which they *conduct or observe strip or body cavity searches*." *Id.* at 495 (emphases added). Although the dissent characterizes the search of Byrd as a pat-down search, *see* Dissenting Opinion, p. 399, we offered a different description of a pat-down search in *Grummett*. There, we defined pat-down searches as searches "done briefly and while the inmates are fully clothed, and thus do not involve intimate contact with the inmates' bodies." *Grummett*, 779 F.2d at 496. In contrast, Byrd was barely clothed at all, and it is undisputed that the female officer twice touched Byrd's penis and scrotum, and searched inside his anus.

In *Michenfelder*, 860 F.2d at 334, we reiterated that "infrequent and casual observation, or observation at [a] distance, . . . are not so degrading as to warrant court interference" (citing *Grummett*, 779 F.2d at 494-95) (parallel citations omitted). Our holding in *Michenfelder* offers no support for a cross-gender strip search. If the panel in *Michenfelder* intended to approve cross-gender strip searches, it would have distinguished *Grummett*, rather than citing the case in support of the panel's ruling.

None of the other cases cited by our colleagues, *see* Dissenting Opinion, p. 395-96, purports to approve cross-gender strip searches in the absence of an emergency. Indeed, neither *Bell*, 441 U.S. at 559-60; *Rickman v. Avaniti*, 854 F.2d 327, 328 (9th Cir. 1988); nor *Thompson v. Souza*, 111 F.3d 694, 700 (9th Cir. 1997), involved cross-gender strip searches, the issue we address in this case.

**[9]** The manner in which the search was conducted weighs in favor of a determination of unreasonableness. Byrd was

searched by a female cadet who was dressed in jeans and a white t-shirt. Other than the name printed on the back of the t-shirt, the officer who conducted Byrd's search was unidentified. Ten to fifteen non-participating officers watched the strip search, and at least one person videotaped the search. Although the dissent relies on the fact that the search was conducted "professionally," *see* Dissenting Opinion, p. 396, we have consistently recognized the " 'frightening and humiliating' invasion" occasioned by a strip search, "even when conducted 'with all due courtesy.' " *Way*, 445 F.3d at 1160, quoting *Giles v. Ackerman*, 746 F.2d 614, 617 (9th Cir. 1984) (per curiam). Furthermore, the dissent's reliance on the jury's finding that the manner of O'Connell's search was appropriate because O'Connell "did not intentionally squeeze or knead Byrd's penis or scrotum or improperly touch his anus through his boxer shorts," Dissenting Opinion, p. 397, ignores the district court's ruling that the cross-gender aspect of the search was constitutional as a matter of law. Thus, the jury was not deciding whether the manner of the search was appropriate despite being performed *by a member of the opposite sex*.

**[10]** The justification for conducting the search weighs in favor of a determination of reasonableness. It is undisputed that the search was initiated due to several recent fights and suspicion of contraband. These circumstances constituted valid reasons to search the inmates, even though no immediate emergency existed. *See Thompson*, 111 F.3d at 700 (noting that the purpose of the search was to "detect illicit drugs"); *see also Michenfelder*, 860 F.2d at 332-33 (recognizing that a search for contraband constitutes adequate justification). Nevertheless, although valid reasons to search the inmates existed generally, there was no justification given for conducting a cross-gender strip search. The dissent glosses over this distinction when emphasizing the jury's finding that there were valid reasons to search the inmates. *See* Dissenting Opinion, p. 393-94. The jury had been specifically instructed not to consider the cross-gender element of the search, and

therefore the jury's finding that a search was justified does not amount to a finding that a search *by a woman* was justified.

**[11]** The final *Bell* factor, the place of the search, similarly weighs in favor of a finding of reasonableness. Byrd was searched in the day room, a common area. Other inmates were present, making it less likely that improper conduct would occur. *See Thompson*, 111 F.3d at 701 (upholding visual strip search of inmate that took place on the tier just outside the inmate's cell within view of other prisoners).

**[12]** Although the last two factors weigh in favor of a determination of reasonableness, the effect of the first two factors is so extreme that a conclusion of unreasonableness is compelled. Courts throughout the country have universally frowned upon cross-gender strip searches in the absence of an emergency or exigent circumstances.[8]

---

[8]The dissenting opinion minimizes the intrusiveness of the search by describing it as a "pat-down of a partially-clothed male inmate." Dissenting Opinion, p. 395. However, the facts of this case clearly reflect that more than a "pat down" occurred. We have defined a "pat-down search" as one involving no intimate contact with the inmate's body. *Grummett*, 779 F.2d at 495-96. In contrast, Byrd was subjected to a search that involved twice moving his penis and scrotum aside and separating the cheeks of his buttocks to search inside his anus. Neither was Byrd partially clothed, legally speaking. Rather, he was wearing only pink, nearly see-through underwear. In most jurisdictions within this circuit, one could not appear in public dressed, (or more precisely undressed) in that manner. *See, e.g.*, Ariz. Rev. Stat. § 13-3501(4) (defining "nudity" as "the showing of the human male or female genitals, pubic area or buttocks with less than a full opaque covering . . ."); Haw. Rev. Stat. § 712-1210 (defining "nude" as unclothed or in attire, including but not limited to sheer or see-through attire, so as to expose to view any portion of the pubic hair, anus, cleft of the buttocks, genitals . . ."). Indeed, the dissent's characterization is inconsistent with *Grummett*, 779 F.2d at 496, in which we approved cross-gender searches "done . . . while the inmates are *fully clothed*, and thus *do not involve intimate contact with the inmates' bodies*." (emphasis added).

If the search conducted were in fact a pat-down search of a partially clothed inmate, we would probably agree that the search was reasonable. However, because Byrd was subjected to a cross-gender strip search while nearly nude, we conclude that the search was patently unreasonable.

In *Cookish v. Powell*, 945 F.2d 441, 442 (1st Cir. 1991) (per curiam), the First Circuit resolved a civil rights complaint alleging that prison officials violated an inmate's right under the Fourth Amendment to be free from unreasonable searches. The inmate's claim was predicated on the fact that "female correctional officers supervised and/or observed him during a visual body cavity search." *Id.* (footnote reference omitted). It was undisputed that the search occurred during "an emergency situation." *Id.* at 448. Plaintiff himself described the prison conditions as a "riot." *Id.* at 444. Understandably, prison officials commenced visual body cavity searches of inmates "to ensure that the inmates were not carrying weapons, matches, combustibles or other contraband . . ." *Id.* at 446 n.7. As in this case, the Plaintiff did not challenge the reasonableness of the search *per se* or the manner in which the search was conducted. *See id.* at 446. Rather, similar to Byrd, the Plaintiff in *Cookish* asserted a violation of his constitutional rights primarily because a female lieutenant was involved, supervising the visual body cavity search from approximately five feet away. *See id.* at 445.

The First Circuit reiterated its recognition "that a severe if not gross interference with a person's privacy occurs when guards conduct a visual inspection of body cavities." *Id.* at 446 (citation, alteration and internal quotation marks omitted). The court also explained that:

> Certainly by the time of this search in 1987, the trend, if not the clearly established law, was that an inmate's constitutional right to privacy is violated when guards of the opposite sex regularly observe him/her engaged in personal activities, such as undressing, showering and using the toilet.

*Id.* (citations omitted).

The First Circuit summarized the state of the law governing cross-gender searches as of late 1987:

(1) inadvertent, occasional, casual, and/or restricted observations of an inmate's naked body by a guard of the opposite sex did not violate the Fourth Amendment and (2) if the observation was other than inadvertent, occasional, casual, and/or restricted, such observation would (in all likelihood) violate the Fourth Amendment, *except* in an emergency condition.

*Id.* at 447 (emphasis in the original).

In sum, almost twenty years ago, the First Circuit ruled, in no uncertain terms, that visual observation of a nude male by a female corrections officer "would (in all likelihood)," violate that inmate's constitutional right to be free from unreasonable searches. *Id.* It is notable that, in determining that the officers involved were entitled to qualified immunity, the First Circuit focused on the emergency conditions surrounding the search. *See id.* at 448 ("The caselaw supports the conclusion that, *in an emergency situation*, a visual body cavity search conducted within the view of a guard of the opposite sex, even if other than an inadvertent and/or restricted view, would not violate an inmate's Fourth Amendment right.") (citation omitted) (emphasis added).

In 1981, the Fourth Circuit similarly recognized the inappropriateness of cross-gender strip searches. *See Lee v. Downs*, 641 F.2d 1117, 1120 (4th Cir. 1981) ("[M]ales subject to frisk *searches by female guards during which the genitals are touched and felt through clothing* [are] entitled to injunctive relief.") (citation omitted) (emphasis added). This description by the Fourth Circuit fits the facts of this case perfectly. The professionalism with which the search is conducted in no way changes the consistent depiction of a cross-gender strip search in the absence of an emergency as violative of Fourth Amendment principles.

In 1999, the Fifth Circuit decided that an inmate stated a valid Fourth Amendment claim when the inmate filed a civil

rights action alleging "multiple strip and body cavity searches performed by a female officer . . ." *Moore v. Carwell*, 168 F.3d 234, 235 (5th Cir. 1999). In reaching its conclusion, the Fifth Circuit distinguished a prior case holding "that the mere *presence* of female officers during a strip search of prisoners during *emergency circumstances* did not violate the Fourth Amendment." *Id.* at 236 (citation omitted) (emphases in the original). As with the other circuits, the Fifth Circuit considered the lack of an emergency a crucial factor in support of the existence of a constitutional violation stemming from a cross-gender strip search. The Fifth Circuit also considered the fact that male officers were present to conduct the search. *See id.* at 237.

In 1994, the Seventh Circuit decided *Canedy v. Boardman*, 16 F.3d 183 (7th Cir. 1994). Canedy sued the corrections facility where he was housed, asserting that his privacy rights were violated when two female guards "strip searched him" "during a shakedown of his housing unit." *Id.* at 184. Canedy also alleged that the violation could have readily been prevented due to the fact that ten male officers were nearby at the time. *See id.*

The district court dismissed Canedy's Complaint for failure to state a claim. The district court determined that any privacy rights possessed by Canedy were outweighed by the prison's interest in providing equal employment opportunities for female officers. The district court specifically ruled:

> If female guards are to be given equal opportunity for employment and promotion, it is necessary to allow them to observe male prisoners and conduct searches just as male officers would. To exclude females from observing or participating in all aspects of guard work could prevent them from gaining the experience they need to advance to higher positions, and bar them from assuming those positions that

require monitoring of inmate searches or other activities in which inmates are unclothed.

*Id.* (citation omitted).

As a preliminary matter, the Seventh Circuit acknowledged the general consensus that a strip search is "one of the clearest forms of degradation in Western Society . . ." *Id.* at 185 (citation and alteration omitted). The Seventh Circuit also recognized that the indignity is multiplied when one's body is exposed to a member of the opposite gender. *See id.* (referencing *York*, 324 F.2d at 455).

Against that background, the Seventh Circuit considered the invasion of the inmate's privacy and the employment rights of the female corrections officers. Rather than agreeing that the employment rights of the female officers trumped the privacy rights of the inmates, the Seventh Circuit concluded that the privacy interests of the inmate must be recognized *and* accommodated. *See id.* at 187. One accommodation cited with approval by the Seventh Circuit was excluding the genital area when conducting cross-gender searches. *See id.*

The Seventh Circuit characterized Canedy's complaint as one alleging that he was subjected to cross-gender strip searches without any effort to accommodate his privacy interests vis á vis the prison's parallel interest in affording equal employment opportunities. *See id.* at 188. In reversing the dismissal of Canedy's Complaint, the Seventh Circuit proclaimed that "[a]lmost every federal court that has addressed this issue has come to the conclusion that the Constitution demands such an accommodation [in the absence of an emergency]"). *Id.* at 187.

In 1995, the Tenth Circuit addressed the issue of cross-gender strip searches in *Hayes v. Marriott*, 70 F.3d 1144 (10th Cir. 1995). Hayes alleged that a video-taped strip search conducted in the presence of, *inter alia*, female corrections offi-

cers violated his constitutional rights under the Fourth Amendment. *See id.* at 1145.

An administrative officer from the Colorado Department of Corrections (DOC) proffered the following justification for the presence of female staff:

> There is no particular DOC policy relating to use of female staff during strip searches. As a matter of courtesy to the inmate population, male staff members are used whenever possible. There is no indication any female staff members conducted a strip search during the dates in question. Although every effort was made to reduce the number of female staff during the search, females are an essential part of our staffing. All posts still had to be covered and females did view parts of the search while conducting their normal duties or observation duties so male staff could conduct the searches. There was no justifiable reason to totally exclude female staff from this required function. Additionally, the total absence of female staff would have alerted inmates to an impending search.

*Id.* at 1147 (citation omitted).

Despite the affidavit from a prison official attesting that no females actively participated in the strip search and despite the expressed staffing considerations in the affidavit, the Tenth Circuit reversed the grant of summary judgment in favor of the prison officials. *See id.* at 1147-48. In doing so, the Tenth Circuit explicitly recognized that an inmate's privacy rights may be violated by a single cross-gender strip search. *See id.* at 1147.

[13] This litany of cases over the last thirty years has a recurring theme: cross-gender strip searches in the absence of an emergency violate an inmate's right under the Fourth

Amendment to be free from unreasonable searches. Because the cross-gender nature of the search is a critical factor in the strip searches discussed in these cases, we cannot agree with our dissenting colleagues that the gender of the officer conducting the search is irrelevant. *See* Dissenting Opinion, p. 395. Interestingly, Maricopa County never challenged the precept that cross-gender strip searches are constitutionally infirm in the absence of an emergency. Rather, it painstakingly attempted to establish that the cross-gender search Byrd underwent was not a strip search. Indeed, Maricopa County's policy prohibits cross-gender strip searches. The admission implicit in Maricopa County's determined effort to avoid having the search characterized as a strip search, coupled with the nearly universal opprobrium expressed in the cases addressing cross-gender strip searches, reflects the extreme degree of unreasonableness presented by the facts of this case.[9]

[14] In this case, the indignity of the non-emergency strip search conducted by an unidentified female cadet was compounded by the fact that there were onlookers, at least one of whom videotaped the humiliating event. For these reasons, we conclude that the cross-gender strip search, as conducted in this case, was unreasonable.[10]

---

[9]We omit *Jordan v. Gardner*, 986 F.2d 1521 (9th Cir. 1993) (en banc), from this discussion because a majority of the *en banc* panel declined to address the Fourth Amendment issue in that case.

[10]Byrd also challenged the district court's admission of the Video Yearbook and the district court's formulation of an adverse inference instruction. However, during trial, Byrd laid the foundation for an adverse inference instruction when he questioned Arpaio about the video footage recorded on the day of Byrd's search. The district court did not abuse its discretion by admitting the videotape because Byrd opened the door to consideration of this evidence when he questioned Arpaio about the video footage. *See United States v. Osazuwa*, 564 F.3d 1169, 1173 (9th Cir. 2009) (reviewing for abuse of discretion the district court's ruling that a party opened the door for introduction of evidence). Additionally, the district court did not abuse its discretion when it declined to use the exact wording Byrd requested for the adverse inference instruction. Byrd's sug-

## IV.   CONCLUSION

We readily acknowledge the deference due prison officials engaged in the admittedly difficult task of administering inmate populations. However, that deference does not extend to sanctioning a clear violation of an inmate's constitutional rights. *See Giles*, 746 F.2d at 617; *see also Hayes*, 70 F.3d at 1146 ("One of the clearest forms of degradation in Western Society is to strip a person of his clothes. The right to be free from strip searches and degrading body inspections is thus basic to the concept of privacy.") (citations, alteration and internal quotation marks omitted).

**[15]** Accordingly, we hold that the cross-gender strip search performed on Byrd was unreasonable as a matter of law under the facts of this case and violated Byrd's rights under the Fourth Amendment to be free from unreasonable searches. We **REVERSE** the district court's entry of judgment as a matter of law in favor of O'Connell and Maricopa County on this claim. We **REMAND** this case to the district court for further proceedings consistent with this opinion.

---

N.R. SMITH, Circuit Judge, concurring in part and dissenting in part, joined by KOZINSKI, Chief Judge, and GOULD, TALLMAN, and BEA, Circuit Judges:

I agree with the majority's conclusion regarding Byrd's claims under the Eighth and Fourteenth Amendments. How-

---

gested language would have impermissibly directed the jury to reach a conclusion about a matter of disputed fact. *See Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 212 (9th Cir. 1988) (explaining that a jury instruction is adequate "even if it does not use the exact words proposed by a party . . ."); *see also Roberts v. Spalding*, 783 F.2d 867, 873 (9th Cir. 1986) (approving the district court's rejection of an instruction that directed the jury to reach a particular conclusion regarding a disputed matter of fact).

ever, (1) the deference we owe prison administrators, (2) the jury's undisputed factual findings, and (3) the relevant case law compel me to conclude that O'Connell's actions were reasonable under the Fourth Amendment. I therefore respectfully dissent from the contradictory analysis in the majority opinion, which held that a female officer's pat-down search of a male detainee—where there were no exigent circumstances showing the unavailability of male officers to do the search—was a violation of the detainee's Fourth Amendment rights.

In determining the reasonableness of a search under the Fourth Amendment, we must balance "the need for the particular search against the invasion of personal rights that the search entails." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). In *Bell v. Wolfish*, the Supreme Court directed us to consider the following four factors when evaluating the reasonableness of a search of an incarcerated person: (1) "the scope of the particular intrusion," (2) "the manner in which it is conducted," (3) "the justification for initiating it," and (4) "the place in which it is conducted." *Id.*[1] The majority correctly identifies

---

[1] Because the majority holds that the factors articulated in *Turner v. Safley*, 482 U.S. 78, 89-91 (1987), are inapplicable to Byrd's challenge and instead focuses exclusively on the Bell factors, Maj. Op. 378 n.6, I too only address the *Bell* factors. It ultimately makes no difference whether we consider the factors articulated in *Turner*, however, as application of the *Turner* factors also compels a finding that O'Connell's search of Byrd was reasonable under the Fourth Amendment. *See Bull v. City and County of San Francisco*, 595 F.3d 964, 975-76 (9th Cir. 2010) (en banc) ("Because the *Turner* factors require us to give more deference to detention officials' determinations than does the balancing test in *Bell*, it is not surprising that our consideration of the *Turner* factors leads to the same conclusion."). In *Turner*, the Supreme Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. at 89. In making this determination, the Supreme Court directed us to consider four factors. *Id.* at 89-91. First, we consider whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Id.* at 89 (internal quotation marks and citation omit-

this test and properly finds that factors (3) and (4)—justification and place, respectively—weigh in favor of a finding of "reasonableness" under the Fourth Amendment. Nevertheless, it erroneously concludes that factors (1) and (2)—scope and manner, respectively—vindicate Byrd's Fourth Amendment claim.

Before addressing the *Bell* factors, however, it is necessary to highlight the limited nature of our review. The Supreme Court has instructed that "[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 547. Therefore, "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to [security and operation considerations], courts should ordinarily defer to their expert judgment in such matters." *Id.* at 540 n.23 (inter-

ted). As discussed more fully *infra*, it is not disputed that the prison officials had a legitimate need to initiate the searches in order to prevent the proliferation of contraband within the prison. Second, we are to consider "whether there are alternative means of exercising the right that remain open to prison inmates." *Id.* at 90. This factor does not apply to Byrd's Fourth Amendment claim; it is somewhat nonsensical to examine whether alternative means exist for Byrd to exercise his right to be free from unreasonable searches. *See Michenfelder v. Sumner*, 860 F.2d 328, 331 n.1 (9th Cir. 1988) ("Not all four factors will be relevant to each case. . . . [T]he second *Turner* factor . . . is much more meaningful in the first amendment context than the fourth or eighth . . . ."). Third, we consider "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner*, 482 U.S. at 90. Again as discussed more fully *infra*, the County offered undisputed evidence that it did not have sufficient numbers of male detention officers to conduct searches of male inmates without the assistance of female officers. Finally, we must examine "the absence of ready alternatives [as] evidence of the reasonableness of a prison regulation." *Id.* Because we must defer to the County's undisputed evidence regarding its staffing needs, we cannot conclude that there were other reasonable alternatives to the search.

nal quotation marks and citation omitted). It is axiomatic that prison officials know better than a panel of judges how to run a prison. Deference to prison officials, therefore, necessarily permeates our review of their searches.[2]

We are also constrained in our review by the jury's undisputed factual findings that: (1) O'Connell did not "intentionally squeez[e] or knead[ ] [Byrd's] penis or scrotum or improperly touch[ ] his anus through his underwear," and (2) O'Connell's search was "done for [an] identified security need." Tempting though it may be to paint the facts differently on appeal, the jury made these findings and Byrd has not challenged them. With these considerations in mind, I now turn to the *Bell* factors and again emphasize that the majority agrees that two of the factors—the justification for the search and place in which it was conducted—weigh in favor of finding O'Connell's search reasonable. Maj. Op. 382-83.

It is appropriate to begin the analysis by looking at the justification for initiating the search, because, in the absence of a proper justification, even the most unintrusive search is unreasonable. The prison officials initiated their searches in response to evidence that contraband was circulating in the jail in the wake of multiple fights that had broken out in Byrd's housing unit. This is not disputed. Maintaining the internal security of the prison was at stake, and the need to eliminate the possibility of dangerous contraband somewhere on a prisoner's person in such a volatile atmosphere certainly justifies initiating the type of search at issue here. *See Mich-*

---

[2]The majority has apparently disregarded this principle, instead relying on a Commission Report and two op-eds to form its own opinions about the logistical wisdom of the searches at issue here. Maj. Op. 378-79. Aside from the fact that the Commission Report and op-eds are not part of the record before us, there is certainly nothing to suggest that they represent the collective wisdom of administrators who understand the conditions at Durango Jail. Those prison administrators deserve greater deference, especially since the evaluation of the reasonableness of a search is heavily dependent on the context of each case.

*enfelder*, 860 F.2d at 333 (holding that, among other things, "testimony and physical evidence . . . [of] contraband" justified the initiation of strip searches). Moreover, it is undisputed that inmates frequently attempt to conceal contraband in their body cavities, thus furthering the need for strip searches as a means of preventing the proliferation of contraband and homemade weapons within the prison. *See, e.g.*, *Bell*, 441 U.S. at 559 ("A detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence. And inmate attempts to secrete these items into the facility by concealing them in body cavities are documented in this record . . . and in other cases."). On top of all this, the jury found that the search was done for an identified security need, which Byrd does not challenge on appeal. In light of such considerations, the prison's need to confiscate all contraband, and therefore initiate these searches, was both pressing and significant. *Id.* at 546-47 ("Central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves.") (internal quotation marks, citation, and alteration omitted).

I next note my agreement with the majority that the last *Bell* factor—the place in which the search is conducted—also weighs in favor of finding the search reasonable. *See Michenfelder*, 860 F.2d at 333 ("[W]e will not question [prison officials'] judgment that conditions in [a prison unit] reasonably require searches outside the prisoners' cells in order to protect the safety of the officers conducting them."); *see also Thompson v. Souza*, 111 F.3d 694, 697, 701 (9th Cir. 1997) (approving an intrusive strip search conducted in view of jeering inmates).

My agreement with the majority ends there, however, as a review of the remaining two *Bell* factors—the scope and manner of the search—also establishes the reasonableness of O'Connell's search of Byrd. Relying on a string of cases that *upheld* both female officers' visual observation of unclothed

males and their performing pat-down searches on males, the majority concludes that, under the first *Bell* factor, "[t]he scope of the intrusion in this case far exceeds searches we have previously sanctioned . . . ." Maj. Op. 380. The majority is wrong.

Dealing first with the scope of O'Connell's search, such search was limited to a pat-down of a partially clothed inmate in an attempt to locate contraband. The search was both reasonable and necessary to ensure prisoners at the Durango Jail were not concealing weapons or other contraband. *Cf. Bull*, 595 F.3d at 969 ("[A]rrestees' use of body cavities as a method of smuggling drugs, weapons, and items used to escape custody is an immediate and troubling problem for San Francisco jail administrators."). In evaluating the scope of a search, the searching officer's gender is irrelevant.

The Supreme Court and the Ninth Circuit have previously validated even strip searches and body cavity searches. *See, e.g.*, *Bell*, 441 U.S. at 558-60 (validating visual inspections of body cavities as part of strip searches in the prison setting); *Thompson*, 111 F.3d 694, 700 (9th Cir. 1997) (holding body cavity searches did not violate clearly established rights under qualified immunity analysis); *Michenfelder*, 860 F.2d at 333 (approving visual strip searches in the prison setting); *Rickman v. Avaniti*, 854 F.2d 327, 328 (9th Cir. 1988) (approving strip searches in prisons). I recognize, of course, that these cases involved only visual searches and no touching (in contrast to O'Connell's search). However, it is clear that pat-down searches can be constitutional even outside of a prison setting. *See Terry v. Ohio*, 392 U.S. 1, 17 n.13 (1968) (describing a frisk as "feel[ing] with sensitive fingers every portion of the prisoner's body . . . the prisoner's arms and armpits, waistline and back, the groin and area about the testicles, and the entire surface of the legs down to the feet" (internal quotation mark omitted)). Pat-down searches are also less intrusive than strip searches. *Giles v. Ackerman*, 746 F.2d 614, 618 (9th Cir. 1984), *overruled on other grounds by*

*Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999) (en banc). The officers here searched the prisoners professionally,[3] following a procedure that minimized physical contact to the extent possible. O'Connell searched Byrd over his boxer shorts, and he doesn't claim she ever looked underneath them. The entire search took no more than a minute. Thus its scope did not "far exceed[ ]" what we have previously sanctioned. *Contra* Maj. Op. 380.

The final *Bell* factor—the manner of O'Connell's search—gives me greater pause. Not lightly do I find reasonable a female officer's probing search of a male detainee wearing only thin boxer shorts. Nevertheless, I believe the precedent and the facts compel this result, unsavory to our sensibilities though that result may be.

I first note "our prior case law[, which] suggests that prisoners' legitimate expectations of bodily privacy from persons of the opposite sex are extremely limited." *Jordan v. Gardner*, 986 F.2d 1521, 1524 (9th Cir. 1993) (en banc). Against that backdrop, we now review our other precedent: (1) female officers may pat down the groin area of fully clothed male inmates, *Grummett*, 779 F.2d at 496; and (2) female officers may observe unclothed male inmates in their cells and in the showers, *Michenfelder*, 860 F.2d at 334. Admittedly, neither of these precedents covers the current situation—a female officer's pat-down of a partially-clothed male inmate. Under the circumstances presented here, however, there is no meaningful difference between Byrd's search and what we have previously upheld. O'Connell never saw Byrd's exposed groin area or his anus, in contrast to the female officers in *Michenfelder*, and the search was done in a professional,

---

[3]The majority's assertion that it makes no difference that a search was done in a professional manner is unconvincing. Maj. Op. 381-82, 385. The court in *Grummett* specifically noted (three times) that female guards' searches were done in "in a professional manner." *Grummett v. Rushen*, 779 F.2d 491, 495-96 (9th Cir. 1985).

swift, and appropriate manner that involved no touching of the flesh under Byrd's boxer shorts. *See Grummett*, 779 F.2d at 496 (validating searches where, among other things, the searches are "done briefly . . . [and] are performed by the female guards in a professional manner"). Moreover, the jury found that O'Connell did not intentionally squeeze or knead Byrd's penis or scrotum or improperly touch his anus through the boxer shorts and that O'Connell's search was done for an identified security need. Again, Byrd has not challenged these findings.

In addition, the County has offered undisputed evidence that the County did not have sufficient numbers of male detention officers to conduct searches of male inmates without the assistance of female officers.[4] Thus, even if it may seem odd to utilize a female officer to conduct a pat-down of

---

[4]The majority argues that Byrd disputed the need to utilize female officers because he testified that male detention officers were present, but did not conduct the search. Maj. Op. 371 & n.2. The majority claims that, as in *Moore v. Carwell*, 168 F.3d 234, 237 (5th Cir. 1999), we should credit Byrd's testimony that some male officers were not participating in the search as evidence that female officers were not needed to perform the search. However, in *Moore*, the court was required to assume Moore's allegations were true when reviewing a motion to dismiss. *Id.* at 236. We are not so constrained in our review; instead, we must consider all the evidence produced at trial. While Byrd testified that not all male officers present conducted the searches, he did not (and could not) testify as to the staffing necessary to safely conduct a search of approximately 90 prisoners and their living quarters. Moreover, the majority's argument that female officers were not necessary for the search was contradicted by testimony from both O'Connell and Captain Peterson. O'Connell testified that having additional officers present was necessary because "[t]here is always a threat" of violence in such situations. Captain Peterson testified that prison officials "don't have the luxury" of having enough male detention officers to search the jail facility. Therefore, they must rely on female officers. He also testified that he could not pull in additional male officers from other facilities to have enough male staff to conduct such searches. Under *Bell*, we are required to defer to the expert judgment of prison officials as to how to maintain prison safety and order—including who should conduct searches and how many officers are needed.

a male inmate when other male officers are present, the realities of the prison's staffing needs justify such searches. *See Michenfelder*, 860 F.2d at 334 ("[R]equiring [female employees] to be replaced by males for the duration of strip searches, would displace officers throughout the prison."); *Grummett*, 779 F.2d at 496 ("To restrict the female guards from positions which involve occasional viewing of the inmates would necessitate a tremendous rearrangement of work schedules, and possibly produce a risk to both internal security needs and equal employment opportunities for the female guards."). This is particularly true since the 10,000 detainees in the Maricopa County system are searched at least daily, and often several times a day. To disallow all female officers from conducting these searches anytime a male officer is present would handicap the female officers as security personnel and perpetuate sexist notions that a female is only useful when a male is not available. Instead of converting Durango Jail into a target for equal employment litigation, I defer to the prison officials' reasoned and sensible judgment on these matters.

In order to provide a basis for its decision, the majority terms this search a strip search, rather than a pat-down search. This is error. True, this search differed somewhat from the prison's definition of a "frisk (body) search," because more than Byrd's socks and shoes were removed. However, it is undisputed that it involved only an inspection of Byrd's (already removed) clothing and "feeling the contours of his clothed body." O'Connell testified that at no point did she pat down or touch any unclothed areas. Thus, the search is more accurately described as a "pat-down," since a "strip search" involves a *visual scan* of the inmate's body after *all* clothing has been removed." Indeed, the strip searches in the cases relied on by the majority were visual inspections of *naked* inmates. *See Moore v. Carwell*, 168 F.3d 234, 236 (5th Cir. 1999) (male inmate "being viewed naked by a female [officer]"); *Canedy v. Boardman*, 16 F.3d 183, 185, 186 n.2 (7th Cir. 1994) (female guards' visual observations of male inmate's "naked body" prohibited, but pat-down searches

constitutional); *Hayes v. Marriott*, 70 F.3d 1144, 1145-47 (10th Cir. 1995) (Visual body cavity search of male inmate in presence of non-essential female staff. The court noted "the Fourth Amendment does not require the complete exclusion of members of the opposite sex from areas in which searches are conducted"); *Cookish v. Powell*, 945 F.2d 441, 444-45 (1st Cir. 1991) (male inmate "had to remove every item of clothing" in view of supervising female officer); *Lee v. Downs*, 641 F.2d 1117, 1120 (4th Cir. 1981) (female inmate had "underclothing . . . forcefully removed" with male guards present); *see also Sec. and Law Enforcement Employees, Dist. Council 82 v. Carey*, 737 F.2d 187, 192 nn.3-4 (2d Cir. 1984) (distinguishing between "strip frisks" (requiring the person being searched to reveal body cavities), visual examinations of naked persons, and pat frisks); *Cookish*, 945 F.2d at 444 n.5 ("A 'strip search,' . . . refers to an inspection of a naked individual"). None of these "strip search" cases involved partially clothed inmates.

The majority's description of this search as a strip search allows it to discount this court's precedent relevant to the case at hand. *Grummett* is on point. This court held that "routine pat-down searches, which include the groin area, and which are otherwise justified by security needs, do not violate the [F]ourteenth [A]mendment because a correctional officer of the opposite gender conducts such a search." 779 F.2d at 495; *see id.* at 496 (finding no Fourth Amendment violation). The majority repeatedly distinguishes *Grummett* because it feels that, unlike *Grummett*, this case involved "intimate contact with the inmate's body." Maj. Op. 383 n.8. This, however, ignores the nature and purpose of a pat-down search. A pat-down is done to detect contraband that may be taped to the contours of an inmate's body, including the genital area. One has to apply enough pressure to contact the areas being searched, and to "be able to feel something that's on the [area searched]."

Given that the purpose of the search is to feel for contraband, the majority's attempt to distinguish *Grummett* solely

on the thickness or extent of the clothing is unconvincing. In order to be effective, the searcher must be able to feel the inside thigh and perineum. On an inmate in street clothes, this may require more pressure, but results in the same contact in the same area. In both cases, no skin to skin contact was made; both searches were only over clothed areas. Both searches were of the same groin area. Both searches were brief and conducted for legitimate security purposes. 779 F.2d at 496. Given the area, nature, and purpose of the search, it would be unreasonable to presume that the female guards in *Grummett* did not face the same challenges O'Connell did.

Moreover, even if this were a strip search, this court's precedent does not suggest that a cross-gender strip search is unconstitutional where the genitals remain covered throughout the procedure. After considering *Grummett*, *Jordan*, and *Michenfelder*, this court noted that "it is highly questionable even today whether prison inmates have a Fourth Amendment right to be free from routine unclothed searches by officials of the opposite sex, or from viewing of their unclothed bodies by officials of the opposite sex." *Somers v. Thurman*, 109 F.3d 614, 622 (9th Cir. 1997). This is even more true when the special concern about "involuntary exposure of [one's genitals] in the presence of people of the other sex" is not implicated. *Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993).

Lastly, the majority seems to rest its analysis of the "manner" factor on the fact that O'Connell was unidentified to Byrd and was wearing jeans and a t-shirt and that there were ten to fifteen non-participating officers present. Maj. Op. 381-82. Even putting aside our heightened deference to prison officials, the majority does not explain how the number of officers, their attire, or their lack of identification somehow outweigh the jury's finding that the search was appropriate,[5]

---

[5]The majority explains that this is relevant because of the "humiliation" of "exposing one's nude body to strangers." Maj. Op. 370 n.1. However,

the professional nature of the search, or the County's undisputed need to utilize its female officers (or even how these facts are relevant). Nor were such facts unreasonable in any event. O'Connell testified that Byrd was allowed to ask her questions but didn't. He talked to other officers after the search was over, and they explained that cadets had helped conduct the search. It was also not unreasonable for some officers not to participate in the search. We see no reason to intimate that a search is constitutionally suspect because not every single officer present laid hands on the prisoner. Surely this cuts the other way, if it cuts at all.[6]

The majority's holding on this point illustrates the risks of not giving proper deference to prison officials. As part of the prison's search for contraband, officials ordered more than ninety inmates out of their cells into the common area. In contrast, there were only twenty-five to thirty Academy cadets and ten to fifteen uniformed detention officers present. At best, the prison officials were outnumbered two to one.

---

it does not explain how identification or uniforms would make the cadets not "strangers." Given their matching white shirts, supervision by other guards, and participation in the search, it was surely apparent that the cadets were present in an official capacity, not just strangers off the street. Moreover, contrary to the majority's assertion, Byrd was not nude. Maj. Op. 370, 383 nn.1, 8. There is no basis in the record for its assertion that the pink boxers were sheer, see-through, or even nearly see-through (which really means not see-through). The majority's reference to Arizona and Hawaii law for the proposition that appearing in public dressed in boxer shorts would be illegal is also unfounded. First, the laws set standards for obscenity, not indecent exposure. Second, and more importantly, the record is clear that at no point did O'Connell see any area covered by the boxer shorts, including the genital area. Therefore, the oft-quoted "desire to shield one's unclothed figure from the view of strangers," *York v. Story*, 324 F.2d 450, 455 (9th Cir. 1963), was satisfied in this case.

[6]The majority also relies on the fact that one or two people in the room, about 30 feet away from Byrd, had video cameras. Maj. Op. 381-82. But we have previously found that some strip searches were reasonable even when transmitted to video screens monitored by guards of the opposite sex. *Michenfelder*, 860 F.2d at 329-30, 333.

Importantly, judges are instructed not to intrude into that sphere of decision making. Deciding to accelerate the searches by using additional assistance from female cadets hardly seems unreasonable in these circumstances. I question second-guessing prison administrators when such credible threats to officers' safety are present. Indeed, I would think such security concerns vindicate the Supreme Court's instruction to defer to prison administrators—an instruction that it seems the majority has too hastily disregarded.

In sum, we are guided by our precedent and bound by Supreme Court precedent, the jury's undisputed factual findings, and our deference to prison officials' expertise in these matters. Balancing the four *Bell* factors in light of these limitations, I conclude that O'Connell's search of Byrd was reasonable under the Fourth Amendment, and I respectfully dissent from the contradictory analysis in the majority opinion.